170 So.2d 360

S & W INVESTMENT COMPANY, Inc.

v.

OTIS W. SHARP & SON, INC.

No. 47261.

Dec. 14, 1964.

Rehearing Denied Jan. 18, 1965.

Irwin, Seelig & Nelkin, Joseph W. Nelkin, New Orleans, for appellants.

Lemle & Kelleher, Allen R. Fontenot, New Orleans, for respondent.

HAMITER, Justice.

In this suit S & W Investment Company, Inc., seeks to recover a sum expended by it for completing a swimming pool which the defendant, Otis W. Sharp and Son, Inc., had originally contracted to build but later abandoned.

The district court's judgment in favor of plaintiff for $2174.95 was reversed by the Court of Appeal, and the suit was dismissed. 162 So.2d 171. We granted certiorari. 246 La. 371, 164 So.2d 359.

The swimming pool was to be built by the defendant, at a contracted price of $4725, in the patio area of a motel proposed to be constructed by plaintiff. It was understood by the parties that, in order to permit the use of plaintiff's heavy equipment nearby and to avoid the risk of damaging the pool tiling and appurtenances during erection of the buildings, the concrete shell of the pool would be provided first and the remaining work (including the installing of tiling, filter, ladders, trim, etc.) would be undertaken following the buildings' completion.

The written contract dated September 12, 1961 provided in part:

"ARTICLE I. SCOPE OF WORK— The Contractor shall furnish all of the material and perform all of the work for the construction of a Swimming Pool as described below.

" * * *

"ARTICLE 3. PROGRESS PAYMENTS—* * * Upon completion of shell (which is all but tile, brick, filter, deck eqpt., plum. line to building, and interior finish), amt. due $3000.00. Remainder due upon completion of pool."

Also, the contract obligated the owner to excavate the pool site, to move the excavated material, and to place the backfill around the shell.

The excavation was performed by a construction company paid by plaintiff, but the work was under the direction and supervision of the defendant. The shell was completed about October 17, 1961, and on October 22, 1961 plaintiff gave to the defendant the $3000 progress payment then due (more particularly hereinafter discussed).

Prior to leaving the job temporarily an employee of the defendant closed a hydrostatic pressure relief valve (which had been installed in the shell as a safety device) by

inserting a plug in it, and he then commenced filling the shell with water by means of a garden hose. He was sent back to the site at least two more days for the purpose of continuing the water filling and (to quote his testimony) "to watch that *our* plumbing, pipes and the shell of the pool wasn't damaged by the equipment being used to backfill." (Italics ours.)

The evidence is to the effect that the safest method of protecting the shell was to fill it with water rather than to depend on the valve. However, before a sufficient amount of water was placed therein the filling operation was discontinued and the hose was removed from the site by defendant's employee.

A heavy rainfall that occurred in early November, 1961 caused the uprooting or "floating" of one end of the shell. Defendant's initial salvage attempts were unsuccessful, and it disclaimed any further obligation when plaintiff refused to augment the contract price.

Plaintiff, thereupon, employed the services of J. Stanley Middleton, d/b/a Family Pools, to make the necessary repairs and to bring the work to operational status for the price of $3899.95. Plaintiff's claim in this suit of $2174.95 represents the difference between the amount paid to Middleton and the balance remaining under the contract with the defendant.

Plaintiff cites and relies on Revised Civil Code Article 2758 which states: "Builder furnishing materials—Destruction of work before delivery—Bearing of loss.—When the undertaker furnishes the materials for the work, if the work be destroyed, in whatever manner it may happen, previous to its being delivered to the owner, the loss shall be sustained by the undertaker, unless the proprietor be in default for not receiving it, though duly notified to do so."

Plaintiff contends that this defendant had obligated itself to construct a complete swimming pool—an indivisible obligation; that the progress payment of $3000, made for the benefit of the undertaker, did not relieve the latter of the responsibility of preserving the entire work until it was finished, delivered and accepted; and that, consequently, under the aforequoted codal provisions any damage thereto occurring before that time must be borne by the defendant contractor.

The defendant apparently recognizes that generally, in the absence of an agreement of the parties, the risk of loss in a *building* contract is on the contractor until he has completed and delivered the work. This can hardly be gainsaid in view of the provisions of Article 2758.

It urges, however, that this particular contract was one "for work composed of detached pieces", to wit: (1) a shell and

(2) the completion of a shell into a finished pool, all as is contemplated by Revised Civil Code Article 2761 which reads: "Delivery of work in separate parts.—If the work be composed of detached pieces, or made at the rate of so much a measure, the parts may be delivered separately; and that delivery shall be presumed to have taken place, if the proprietor has paid to the undertaker the price due for the parts of the work which have already been completed." It argues that under the provisions of this article there arose a presumption of delivery to and acceptance by the owner when the latter paid for that "piece" (the shell) already completed; and that, therefore, following such payment, and pending the finishing of the entire work, the risk of loss of such "piece" was on the owner.

The Court of Appeal (as did the district court) found that, within the contemplation of the parties, the obligation undertaken by this defendant was an indivisible one; and it was inclined to the view that, under the circumstances, the provisions of Article 2758 placed the loss on the undertaker. However, a majority of its members determined that two prior decisions, N. Levy and Son v. Paquette et al., 144 La. 244, 80 So. 269 and Industrial Homestead Association v. Charles A. Junker et al., Orleans Appeal, No. 7402, Unreported (February 13, 1919, cert. den. May 9, 1919— 2 Peltier's Orleans Appeals 80) required a different holding, and they felt constrained to follow their interpretation of those decisions which was to the effect that when stage or progress payments are provided for in an otherwise indivisible building contract, and when the owner makes such payments, there arises a presumption of delivery and acceptance of the then completed portion of the work so as to place on the owner the risk of loss thereof pending performance of the entire contract.

We agree with the Court of Appeal's conclusion that the obligation here was an indivisible one and that it did not constitute two obligations to do two different things. Under it, for a stipulated price, the contractor was obliged to construct and deliver a completed swimming pool—not to build a shell for a price and to finish a shell at another price.

Divisible and indivisible contracts are dealt with in the Revised Civil Code Articles 2108–2116. Specifically, the first two of these articles provide: "Divisible or indivisible—Distinguishing features.—An obligation is divisible or indivisible, according as it has for its object, either a thing which, in its delivery or a fact which, in its execution, is or is not susceptible of division, either material or intellectual." Article 2108. "Indivisibility under terms of obligation.— The obligation is indivisible, though the thing or the fact which is the object of it, be by its nature divisible, if the light, in

which it is considered in the obligation, does not admit of its being partially executed." Article 2109.

Clearly the contract under consideration does not admit of its being only partially executed. Neither the shell by itself nor the finishing operation alone is a complete work fit for the use intended as the object of the agreement. The so-called "detached pieces" (if a finishing operation can be considered as a "piece") are totally interdependent and such interdependence was the principal motive of the contract. The worth of each component part is increased by its union with the other, and the absence of one renders the other virtually useless or without value.

■ That such was the understanding of the parties is clearly evidenced by their actions at an unsuspicious time. Thus, when the defendant requested the progress payment, it did not submit a bill for the "construction of a swimming pool shell". Rather, the bill read:

"OTIS W. SHARP & SON, INC.
General Contractors
P.O. Box 5164      2401 Rousseau St.
New Orleans 15, La.

| "Name | S & W INVESTMENT CO. 7525 Airline Highway New Orleans, La. | Date 10/20/61 Bill No. 1991 |
|---|---|---|
| "Job | SWIMMING POOL 7525 Airline Hwy. First Request for *Partial Payment* | $3000.00" |

———◆———

And the inscription on plaintiff's check issued on October 22, 1961 in payment of such bill recited: "First *partial payment* on swimming pool contract." (Italics ours.)

We consider the above quoted language as evidence of the intention of the parties that neither considered the agreement as constituting two separate and severable obligations to the extent that the progress payment would settle in full one of them. The defendant's obligation, in other words, was indivisible. It was not transformed into a

divisible one by the mere provision for the making of partial payments as the work progressed.

Also, for the foregoing reasons, the contract cannot be considered as a conjoint one within the contemplation of Revised Civil Code Article 2063, as urged by the defendant. That article provides that a contract is conjoint when the obligations are severally comprised therein, and that the obligor may, when he wishes, force the creditor to receive them separately. Clearly the obligations undertaken by this defendant were not several and separable. They, as above shown, were totally interdependent. Obviously, for instance, the defendant could not have required the plaintiff to accept only performance of the "finishing" work.

Inasmuch as defendant's obligation was not divisible, i. e., it was not for work composed of "detached pieces", Article 2761 is inapplicable. From which it follows that the progress payment cannot form the basis of a presumptive delivery of the work as of the time it was made; and in the absence of such delivery, as well as of an acceptance by the owner, the swimming pool construction remained at the risk of the contractor until its complete performance. Article 2758.

We have carefully examined the decisions relied on by the majority of the Court of Appeal (and cited by the defendant), but we

do not find that they conflict with the result reached herein by us.

In N. Levy and Son v. Paquette et al., supra, Paquette had contracted with the Town of Mandeville to build a sea wall for a specified sum, using concrete piles as recited in the contract. The agreement contained a provision that when the piles were made the town would pay to the contractor $10,000. Following completion of the piles they were inspected, approved and *formally accepted* by the town council. Under a subrogation agreement between the contractor and the manufacturer of the piles, the $10,000 was paid to the latter (not the contractor) who gave a receipt "in full acquittance therefor". The court held the contract to be a divisible one—for the furnishing of the piles and for the building of the sea wall—and that when the town *actually accepted* the piles and made payment it became the owner thereof, precluding attachment by a creditor (plaintiff in the suit) of the contractor. Conceding the correctness of this reasoning, it is clear that the court did not hold that a mere progress payment, *without actual delivery and acceptance*, would effect a transfer of ownership of a partially completed work.

In Industrial Homestead Association v. Charles A. Junker et al., supra, the defendant agreed to build a house for plaintiff for a stipulated sum, the contract containing a provision for progress payments during the course of the construction. After one pay-

ment was made a storm blew down the partially completed structure. Reconstruction was commenced, but after the making of the second progress payment the building was again demolished by more violent winds. The defendant was then *prohibited from rebuilding* by the city architect who found the plans, *furnished by plaintiff*, to be defective. In the suit, in which plaintiff sought to recover his two progress payments, the court held that under the mentioned circumstances the contractor refused to finish the work only because it was impossible to do so on account of the owner's defective plans; and that, consequently, such refusal did not constitute an arbitrary abandonment of the contract but was legally justified. As to another aspect of the case the court further found that the collapse itself was the result of the owner's faulty plans, and it held that when a partially completed work is destroyed *due to the fault of the owner* the loss is his.

However, in the Junker case, despite such two holdings, the court did indulge in speculative observations regarding the effect of the progress payments on the risk of loss, it citing (among others) many common law authorities. Nevertheless, because of its firm holdings resulting from its factual finding that the owner's plans were defective and caused the loss, it is clear that such observations were purely dicta. Consequently, our refusal to grant a writ in the matter did not indicate an approval of the dicta contained in the opinion.

▮ Alternatively, the defendant urges that because of the expected, rather lengthy, time interval between the construction of the shell phase and the ultimate completion of the pool, and since it (the defendant) would not be in control of the site for the entire ensuing period, the parties had agreed that the owner would assume all responsibility for the partially built pool, including the filling of it with water. The defendant argues, in other words, that by agreement it was relieved of the legal obligation resulting from the contract.

There appear to be no provisions in the law, and we have found no jurisprudence, relating to the effect of such an agreement in a building contract. Nevertheless, we can conceive of no reason why the contracting parties may not, by special covenant, relieve the contractor of the risk which would otherwise be his. However, the burden of proving its existence would be on the latter.

The record here reveals a direct conflict concerning whether or not such a special covenant existed. The district court resolved the conflict favorably to plaintiff, and the Court of Appeal appears to have approved this conclusion. Our review of the record discloses no error in such resolution of the trial judge who saw and heard the witnesses. (In fact we think that the

action of the defendant in having its employee commence the water filling of the shell, as well as having him protect the shell and pipes during the backfill operation, supports the finding. Furthermore, Mr. A. C. Cross, called by defendant as an expert swimming pool contractor, stated that he would not have gone off and left the shell unfilled for an indeterminate length of time and that "I'd either fill it or see it was filled".)

Another circumstance unfavorable to the position of the defendant is that its employee plugged the hydrostatic pressure relief valve—a device intended to protect against just such an event as occurred here. It is true that, according to expert testimony, such a valve is not "fool proof", and that sometimes "floating" results despite the valve's being operative when there is a very rapid rise of the water level under the pool. However, we find no evidence in this record from which we can conclude that the water level rose so rapidly as to have rendered the valve inadequate for its purpose. It appears to us that the defendant, having caused the valve to become inoperative, was obliged to insure the filling of the shell as the alternative method of protecting it.

For the reasons assigned the judgment of the Court of Appeal is reversed and set aside, and the decree of the district court awarding to plaintiff the sum of $2174.95 is reinstated and made the judgment of this court. The defendant shall pay all costs.