246 So.2d 880 (1970)
Perry J. SEGURA, Plaintiff-Appellee,
v.
UNITED STATES AIRCRAFT INSURANCE GROUP, Defendant-Appellant.
No. 3218.
Court of Appeal of Louisiana, Third Circuit.
November 18, 1970.
On Rehearing March 10, 1971.
Rehearing Denied March 31, 1971.
Writ Refused May 20, 1971.
Deutsch, Kerrigan & Stiles by Francis G. Weller, New Orleans, for defendant-appellant.
Johnson & Woods by Robert E. Johnson and L. Hallman Woods, Jr., New Iberia, for plaintiff-appellee.
*881 Before FRUGE, SAVOY, and HOOD, JJ.
FRUGE, Judge.
The plaintiff, Perry J. Segura, brought this action to recover a money judgment for damage sustained to his twin-engine Piper airplane. The suit was brought against the defendant, United States Aircraft Insurance Group, the liability insurer of Pelican Aviation Corporation. Pelican is a fixed-base operator who stored and serviced plaintiff's airplane at facilities which Pelican leased at the New Iberia Airport. Defendant, United States Aircraft Insurance Group, filed a third-party demand against Harold Landry. After a trial on the merits, the district court entered judgment in favor of the plaintiff. Judgment was also entered in favor of U.S.A.I.G. on its third-party demand against Harold Landry. Defendant appeals suspensively from that part of the judgment decreeing defendant to be liable to plaintiff. In addition, plaintiff in answer to this appeal prays that the award of the trial court be increased to include an element of damages denied by the district court.
The plaintiff, pursuant to a verbal agreement with Pelican Aviation, had for some time stored his aircraft at the Pelican Aviation hangar located at the New Iberia Airport. Pelican Aviation undertook to store and service the plaintiff's aircraft, for which services Pelican was compensated by the plaintiff.
On February 12, 1967, pursuant to Segura's instructions, employees of Pelican Aviation removed Segura's aircraft from the Pelican hangar, prepared it for use later in the day, and left the plane outside on the concrete apron adjacent to Pelican's hangar. Later that same afternoon, Harold Landry, a twenty-year-old minor emancipated by marriage, drove his automobile across the concrete apron adjacent to the hangar on his way to a drag race which was being conducted on a nearby abandoned runway at the airfield. The appearance of a State Police officer at the airport caused both participants and spectators to begin leaving the drag race, as they knew they had no permission to be drag racing on the airport property. Landry returned from the direction of the dragstrip, again driving across the concrete apron adjacent to the hangar. It appears that some others also used Pelican's premises while leaving the scene of the aborted drag race. Landry negligently drove his automobile into a wing of the airplane, which collision severed the wing tank and broke off part of the end of the wing.
The plaintiff contends that Pelican Aviation, having had full custody, care, and control of the aircraft, was negligent in allowing automobile traffic to traverse the concrete apron near and around where the airplanes were kept. Plaintiff further alleges that there existed a depositary relationship between plaintiff and Pelican Aviation and that Pelican Aviation as a compensated depositary violated the standard of care required of a depositary by Article 2937 of the Louisiana Civil Code.
The record reveals that during the afternoon of the accident and on previous occasions, automobiles had used the apron on Pelican's property as a means of ingress and egress to other facilities located at the New Iberia airfield. It is plaintiff's contention that when Pelican failed to take steps to prohibit this use by automobile and other vehicular traffic on the apron adjacent to the hangar, Pelican breached a legal duty owed to the owner, and this breach was the proximate cause of the accident.
The trial court found:
"* * * that Pelican Aviation Corporation, by virtue of its agreement to store, service and repair plaintiff's aircraft, for which it was paid a monthly fixed fee, plus payment for fuel and other services, became a compensated depositary or bailee for plaintiff's aircraft, and as such was `bound to use the same diligence in preserving the deposit that he uses in *882 preserving his own property' (R.C.C. Art. 2937)." Tr. 153.
We agree with the trial judge that a depositary relationship existed between the plaintiff-appellee and Pelican Aviation Corporation. It is evident that, pursuant to a verbal contract between Pelican and Segura, Segura left and stored his airplane with Pelican, for which services Pelican was compensated by the plaintiff. Pelican thereby became a compensated depositary or bailee. Under Article 2937 of the Louisiana Civil Code, "the depositary is bound to use the same diligence in preserving the deposit that he uses in preserving his own property." Under Article 2938 of the Louisiana Civil Code, the responsibility set out by Article 2937 is to be strictly construed in the case of a compensated bailee.
The question, then, before this court is whether or not there was a negligent failure on the part of Pelican in the legal duties owed to Segura.
The record indicates that Pelican Aviation, under a lease agreement with the New Iberia Airport Authority, has control and use of a small area of the New Iberia airfield. There are other facilities, operations, and activities at the airfield over which Pelican does not exercise control. There was contradictory testimony as to whether or not Pelican Aviation took steps to prohibit the use of the concrete apron near its hangar, by vehicular and other traffic, going to and from other facilities on the airfield.
It is a well settled jurisprudential rule in this state that where the plaintiff shows the existence of a contract of deposit, and then shows that damage or loss was sustained to the deposit, the burden of proof then shifts to the depositary to show that the loss was not occasioned by any negligence on his part. Paterno v. Kennedy The Cleaner, 18 La.App. 649, 138 So. 531 (1931); Jacques v. City Parking Service, 97 So.2d 78 (Orl.App.1957); Indiana Lumbermen's Mutual Insurance Co. v. Humble Oil & Refining Co., 170 So.2d 264 (La.App. 2d Cir. 1965); Neeley v. Tamburello, 187 So.2d 526 (La.App. 4th Cir. 1966); Taylor v. Haik, 208 So.2d 433, 434 (La.App. 4th Cir. 1968).
The trial judge found that there was little evidence to indicate that Pelican Aviation had done anything to protect or safeguard airplanes parked on the apron, in spite of its prior knowledge that vehicular traffic from time to time used the apron in going to and from other facilities located at the airport. It is axiomatic that this finding of fact by the trial court ought not to be disturbed on appeal, unless it can be said that such finding amounted to manifest error.
In the instant case, the defendant-appellant has failed to show that its insured took any effective steps to stop people from driving across the apron adjacent to its hangar in order to get to and from other facilities at the New Iberia Airport.
Defendant urges that it is irrelevant that Pelican failed to place barricades or barriers near its hangar and apron, because Landry was coming from the direction of the central area of the airfield, and since barriers could only have stopped traffic from coming off the outside road onto the apron and not traffic already on the airfield. The record reveals, however, that Landry drove across the Pelican facility near parked aircraft when entering the airfield, following other automobiles which entered by the same route. He stopped and asked directions from an employee of Pelican, and was not told that Pelican forbade the use of its apron by automobiles. Once Landry used this route to enter the airfield, it would not be improbable to expect that he would return by the same route, and it would not be unforeseeable that an accident would result causing damage to one or more of the aircraft entrusted to Pelican.
While the defendant poses several arguments relating to interpretation of the *883 liability insurance policy issued to Pelican, nonetheless defendant concedes that coverage is provided if it is found that Pelican failed in a legal duty owed the plaintiff. We hold that the accident and damage in question resulted from such a failure in the legal duty owed by defendant's insured to the plaintiff.
The other question posed for our consideration in the instant case involves the proper determination of the appropriate award of damages by the trial judge.
Plaintiff purchased his twin-engine Piper aircraft on December 28, 1966, for $59,190. It was damaged on February 12, 1967. At this time, it had only 62 hours of flying time on it. Segura paid $2,028.08 to have the aircraft repaired. The cost of the repairs is not contested.
In addition to the amount paid for repairs, plaintiff claims damages for the depreciated value of his aircraft as a result of the accident. We find no error in the trial judge's determination as to this element of damages, and adopt his award thereof and his reasons therefor:
"Plaintiff has proven to the satisfaction of the court that his aircraft has depreciated in value as a result of the accident. Mr. Paul Fournet (Tr. 150) and Mr. Reggie Griffith (Tr. 179) (both men of long experience in the aircraft business), testified that this aircraft, and indeed any aircraft which sustains serious damage, is compromised structurally and is thereafter considerably depreciated. They testified that a prospective purchaser who was aware that the plane had been damaged would be reluctant to purchase it, or only at a reduced price. And, further, anyone who was interested in purchasing such an aircraft would, by the simple procedure of reviewing the airplane's log wherein the damage would be required to be noted, would be placed on notice of the damage. This testimony is uncontradicted.
"Thus, plaintiff has proven that his airplane was depreciated in value as a result of the accident. Segura sold the airplane after the accident for $40,000.00. Griffith testified that just before the accident it was worth $53,100.00. Fournet testified that just before the accident the airplane was worth $51,000.00. Thus, Griffith valued the depreciation at $13,100.00, and Fournet at $11,000.00. Both of these men are highly qualified in their field, and the court was impressed with the quality and sincerity of the testimony of each. Therefore, the court will average their testimony and award Segura the sum of $12,050.00 in damages for depreciation."
Prior to the sale of the airplane by Segura, he removed from the airplane an instrument known as a transponder. The value of the transponder was $1,600. Therefore, the value of this item was subtracted from the total of the cost of repairs and the depreciation, and the total award was $12,478.08.
On appeal, plaintiff-appellee argues that the trial judge erred in failing to allow his claim for additional damages consisting of the cost of renting airplanes for business purposes while his damaged aircraft was being repaired. Plaintiff testified, however, that at the time of the trial the rental bills, which at that time were more than one year old, had never been paid. In addition to this fact, plaintiff further testified that the figures which he offered as the amount of damages he sustained due to rentals, were only approximations based on the amount of hours he generally flew in a year's time and the average cost of renting an airplane. From this offering, the trial judge could not say that plaintiff had proved to the satisfaction of the court this element of damages.
If, in fact, appellee actually rented airplanes during the time his plane was being repaired, he has failed to prove this fact. If, however, appellee borrowed planes from *884 people and later was to allow them to borrow his airplane in return, then appellee has suffered no loss or damage thereby for he would have used his plane this much had it never been damaged.
While a plaintiff is entitled to recover all damages sustained by the fault of another, it is incumbent on plaintiff to prove each and every element of those damages. We hold that as to this element of damages, plaintiff has failed to sustain his burden of proof. Plaintiff has not proven the damages he allegedly sustained due to rentals.
For the above and foregoing reasons, the judgment of the District Court is affirmed. All costs to be paid by defendant-appellant.
Affirmed.

ON REHEARING
SAVOY, Judge.
We have been persuaded that the negligence of Harold Landry in running into Segura's properly parked aircraft was not a reasonably foreseeable consequence of Pelican's failure to prohibit all traffic from its aircraft parking apron.
Pelican Aviation had control of only a fraction of the area managed by the Iberia Parish Airport Authority. Buildings next to Pelican's hangar were leased to Gulf South Research Institute and to the University of Southwestern Louisiana. Property still under the Airport Authority's control included the abandoned runway area where the drag race took place on February 12, 1967, the day of the accident.
Other activities either authorized or permitted by the Airport Authority on airport property were farm operations, auctions, storage of chemical supplies, the use of the old administration building (past which most drag racers drove to get to the racing abandoned runway), polo games, use of underground storage tanks, commercial and industrial development of the property, storage of pipe, and test driving. Additionally, the Authority permitted model airplane clubs to use the area for their contests until the FFA prohibited this activity.
Pelican Aviation had no authority to interfere with the activities of drag racers, polo players, rabbit hunters, model airplane enthusiasts, farmers, test drivers, auctioneers and representatives of business and industry using the abandoned runway and lands surrounding Pelican.
Employees and customers having business with Pelican used the apron and parked their cars in the vicinity of the hangar. Paul Fournet, manager of a company similar to Pelican Aviation, but located at Lafayette Airport, testified as plaintiff's witness. He stated that they made an effort to prevent traffic on their ramps, but admitted that, "we have traffic on our ramps." The signs prohibiting traffic on the ramp at Lafayette Airport were posted by the Lafayette Airport Commission. This would indicate that the Iberia Parish Airport Commission should install similar signs at the Iberia Airport. Plaintiff Segura is chairman of the Iberia Parish Airport Commission.
Sometime before this accident, Pelican requested that the Airport Commission stop personnel from USL and GSRI from using Pelican's apron as a passageway. A gate was locked which substantially relieved traffic.
We attach a plat showing relevant areas. The information shown was taken from aerial photographs in evidence, and the plat is not to scale. The route taken by most cars to and from the drag race is shown by a line of dashes. The route taken by Landry and two or three other cars is shown by a line of zeroes. The "T" on the Pelican apron indicates the location of the airplane when it was struck by Landry's vehicle.
*885 
While on patrol on Highway 90, Trooper Louis W. Belaire saw drag racing on the abandoned airstrip and radioed the Sheriff's office to determine whether or not the racing was authorized. The Sheriff's office telephoned plaintiff Segura, the Chairman of the Airport Authority, and learned that the drag racing was not authorized. A deputy sheriff and the trooper proceeded in separate vehicles to the drag strip to stop the races. As they appeared, the group broke up in a rather orderly fashion. Most of the traffic departed by the shortest route by the abandoned terminal building, but Landry drove out of his way to drive on Pelican's apron.
Landry had ample room to drive to his left and pass the airplane, but he struck the starboard wing of Segura's Twin Comanche about two feet from the wingtip. He explained that he was just careless. The trooper smelled a heavy odor of alcohol on his breath.
*886 Plaintiff's airplane had been stored in Pelican's hangar. About 3:30 P.M. on this Sunday, February 12, 1967, Segura telephoned instructions to Pelican's employees to ready his plane to take two passengers to New Orleans departing at 4:00 P.M. The plane was promptly moved to the apron immediately in front of the hangar and parked heading toward the taxiway for easy departure. The concrete apron is 50 feet wide, and the plane has a wingspan of approximately 32 feet. The plane was placed on the apron so that the port wingtip was approximately 6 feet from the hangar door. Thus, some 12 feet of the apron remained on the starboard side of the plane for Segura to drive to his plane to help his guests aboard.[1] Ample room remained for another vehicle to pass on the starboard side of the plane. Additionally, there was a firm sod area adjacent to the concrete apron.
Segura's airplane was properly parked exactly where it should have been. It was taken out of the hangar after Segura telephoned instructions to ready his plane for a 4:00 P.M. departure. Segura expected Pelican to put his airplane on the apron when he telephoned.
The duty allegedly breached by Pelican is not that owed by every person to refrain from harming others under LSA-C.C. Art. 2315. This is a contract action. The duty of the depositary is more onerous than that owed under Article 2315, which is simply to use reasonable care to refrain from harming the property of others. The depositary owes a duty to preserve the deposit, and if the deposit is damaged, the depositary has the burden of showing that he is free of negligence. Pelican was bound to use the same diligence in preserving plaintiff's airplane that it uses in preserving its own property, but it was not an insurer. LSA-C.C. Art. 2937 et seq. We find that Pelican has discharged its responsibility.[2]
In the present case, the alleged wrongdoing was allowing traffic to use the apron on which plaintiff's aircraft was parked. Perhaps it would be a breach of its duty for defendant to allow traffic to freely use the apron where it stored planes. But, it was not established that traffic freely used this area. On the contrary, Pelican complained to the Airport Commission some time before this accident, and the problem was relieved to some extent. Furthermore, it was established that other airports also permitted limited traffic on their aprons.
Although Landry's vehicle and one or two others crossed the apron to go and come from the unauthorized drag races, it is not shown that the volume of traffic using the apron was an unreasonable hazard to parked planes.
The question here is whether the depositary used the same diligence in preserving the deposit that he would have used in preserving his own property. We think the duty imposed on the depositary is to exercise reasonable care to protect the property against reasonably foreseen damages. In this case we believe the insured exercised the degree of care required of it.
Of course, it can be argued that if limited traffic was allowed to use the apron, eventually one vehicle would be carelessly operated and would hit a parked airplane. However, this was remote under the facts. Pelican should not be required to foresee that Landry, in his haste to escape from the unauthorized drag races when the police cars appeared, would use this circuitous and little used route and recklessly strike plaintiff's parked plane.
The judgment of the trial court is reversed and set aside. Plaintiff's suit is *887 dismissed at his costs, both at trial and on appeal.
Reversed and rendered.
FRUGE, J., dissents with respect for reasons assigned in original then majority opinion.
NOTES
[1] On previous occasions, Segura drove on the apron to get close to his plane.
[2] We note that the trial court awarded judgment to Pelican as against Landry. There was no appeal as to that part of the judgment.